**QUICK AIR FREIGHT, INC., Plaintiff,**

v.

**TEAMSTERS LOCAL UNION NO. 413, Defendant.**

No. C–2–82–1158.

United States District Court, S.D. Ohio, E.D.

Dec. 5, 1984.

James M.L. Ferber; Shottenstein, Zox & Dunn, Columbus, Ohio, for plaintiff.

Jerry L. Riseling, Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

### I. PROCEDURAL BACKGROUND.

Plaintiff Quick Air Freight, Inc. ("Quick Air") commenced this action on September 24, 1982, pursuant to section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), against defendant Teamsters Local Union No. 413 ("Local 413") for an alleged breach of a collective bargaining agreement between Quick Air and Local 413 covering plaintiff's mechanics. It is alleged that the collective bargaining agreement, effective from September 30, 1979 through September 26, 1982, set forth mandatory grievance and arbitration provisions for the resolution of employees' complaints as well as a "no strike clause" and that, in breach of the contract, the defendant, its officers, agents, representatives, and members on July 6, 1982, engaged in a strike. Plaintiff did not seek

injunctive relief under *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), to compel its mechanics to return to work and resort to the grievance and arbitration procedures, but instead sought compensatory and punitive damages against Local 413 and certain of its officers and members.[1]

On November 5, 1982, Local 413 filed its answer and a counterclaim, alleging in the counterclaim that Quick Air breached a collective bargaining agreement between Quick Air and Local 413 covering Quick Air's regular drivers and combination drivers-dockmen by refusing to pay these employees a fifteen cent raise due January 1, 1982, under the terms of that agreement.

On March 25, 1983, Local 413 filed an amended counterclaim in which it asserted in Count I the alleged breach of the collective bargaining agreement involving the raise due the drivers and drivers-dockmen and added by Count II another alleged breach of the same agreement involving Quick Air's refusal to provide medical coverage for employees who had retired during the period the agreement covering the drivers and drivers-dockmen was in effect.[2]

On June 13, 1983, Quick Air moved to dismiss both counterclaims or for summary judgment thereon, based on the pleadings; the deposition of Keith L. Milburn, a former business agent of Local 413; and various documents submitted with plaintiff's motion.

## II. LOCAL 413'S COUNTERCLAIM FOR AN ALLEGED BREACH OF THE COLLECTIVE BARGAINING AGREEMENT BECAUSE OF QUICK AIR'S REFUSAL TO PAY THE FIFTEEN CENT ($.15) RAISE.

### A. FACTS.

On November 26, 1979, Quick Air and Local 413 executed a collective bargaining agreement covering the regular drivers and combination driver-dockmen who were employed at Quick Air's Columbus, Ohio terminal. Article 23 established the agreed upon hourly rates for regular roster employees as follows:

| July 1, 1979 | July 1, 1980 | Jan. 1, 1981 |
|---|---|---|
| $8.30 per hour | $8.80 per hour | $8.95 per hour |

| July 1, 1981 | Jan. 1, 1982 | |
|---|---|---|
| $9.50 per hour | $9.65 per hour | |

The agreement also included various provisions dealing with a grievance and arbitration procedure, which are discussed in detail, *infra*. The agreement was effective July 1, 1979, to continue in effect until July 3, 1982, and from year to year thereafter unless notice in writing was received by either party from the other not less than sixty (60) days prior to July 3, 1982, or any subsequent anniversary thereof, advising the other party of its desire to terminate, revise, amend, or change the provisions of the agreement.[3]

In late 1981 and early 1982 Quick Air attempted to negotiate changes in the agreement to obtain a wage and benefit reduction, but was unsuccessful in doing so. (Affidavit of John J. Gordon at p. 2.) It appears undisputed that Quick Air then failed or refused to pay its employees the fifteen cent ($.15) raise due them under the agreement on January 1, 1982. On or about January 8, 1982, a grievance was filed by "Robert M. Frye and all Quick Air Frgt. Drivers," alleging that "Company is in violation of Article 23 of Contract. Requesting all drivers be paid 15¢ raise due Jan. 1, 1982." (Affidavit of John J. Gordon, Exhibit B.)

Since the grievance was not resolved by agreement at the local level under Steps 1 and 2 of the grievance procedure, it was submitted under Step 3 to the Ohio Joint State Private Carriage and Miscellaneous

---

1. On November 24, 1982, the parties filed a stipulation dismissing the individual defendants.

2. Although the collective bargaining agreement on which the counterclaims are based is not the agreement on which Quick Air's complaint is based, no issue has been raised concerning the procedural propriety of the two counterclaims. Fed.R.Civ.P. 15.

3. Although not a part of the record now before the Court, it is assumed that the union or the company served the sixty day notice prior to July 3, 1982.

Contracts Grievance Committee (the "Joint Committee"). The February, 1982, Minutes of the Joint Committee show the following disposition of the grievance:

> Local 413 Columbus (Robert Frye, et al.) v. Quick Air Freight
>
> Rep: —K. Milburn Employer —No representative available
>
> Summary: The parties were paged by the Sgt.-At-Arms. No company representative was available.
>
> Decision: (Unanimous) Based on the fact that the company representative failed to appear, the benefits of the grievance procedure are withdrawn.

(Deposition of Keith L. Milburn, Exhibit 3.)

On or about June 9, 1982, Local 413, on a Joint Committee grievance form, requested clarification of the Joint Committee's decision. On the same date Mr. Milburn, the union's business agent, wrote to the President of Quick Air requesting that the company "abide by the Committee decision of grievance no. P–36–2(12) heard on February 25, 1982, Local 413 Columbus (Robert Frye, et al.) vs. Quick Air Freight." (Deposition of Keith L. Milburn, Exhibit 5.)

It appears that efforts to negotiate a new contract reached an impasse on July 1, 1982, and after expiration of the contract on July 3, 1982, the employees went on strike on or about July 6, 1982.

The August, 1982 minutes of the Joint Committee show that the July 9, 1982, grievance seeking "clarification" of the Committee's earlier decision was "withdrawn from agenda."

According to the deposition testimony of Mr. Milburn, he in fact did receive a clarification of the Committee's earlier decision through a telephone conference with Kevin McDonnell, Assistant Secretary of the Joint Committee who, in response to Mr. Milburn's inquiry, stated:

> "Well, it means that beings that the company representative didn't appear, most of the time they write down here 45–1–G, which means that they lose by default, and you automatically won the grievance," and "that decision right there means that you can do and take whatever process you need to make them uphold the committee decision."

(Deposition of Keith L. Milburn at pp. 19–20.)

The grievance and arbitration procedure of the agreement provided that if a grievance were not resolved by the Joint Committee (Step 3), either of the parties could submit the matter to an impartial third person for arbitration (Step 4). According to Mr. Milburn, the union did not pursue arbitration because "step three had already been fulfilled, and the committee had made a decision in our favor. Therefore, there was no step four to go to." (Deposition of Keith L. Milburn at p. 24.)

## B. EXHAUSTION OF CONTRACTUAL REMEDIES.

Quick Air contends that Local 413's counterclaim should be dismissed on the ground that the union "by electing not to invoke the contractual arbitration procedure ... failed to exhaust the grievance and arbitration procedure mandated by the agreement." (Plaintiff's Memorandum in Support of Motion at p. 6.)

 It is now well settled that "federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by the employer and union as the mode of redress" before resorting to federal court to enforce the terms of the collective bargaining agreement by an action under section 301 of the Labor Management Relations Act. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1964) (emphasis in original). It is equally well settled that an exception to the exhaustion requirement exists where the effort to proceed with contractual remedies would be futile. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Glover v. St. Louis-San Francisco Railway Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). In the present case, Local 413 contends that the futility exception is applicable because Quick Air, after unsuccessfully attempting to obtain contract concessions from the union, "ceased

following the collective bargaining agreement and specifically discontinued following the grievance procedure and other contractual obligations." (Affidavit of John J. Gordon at p. 2.) Quick Air disputes this contention, but offers no explanation for its failure to appear and contest the grievance at the third step hearing before the Joint Committee.

Both parties vigorously debate the question of whether the futility exception is applicable in this case. It is clear that the union, on behalf of the drivers and drivers-dockmen, *did* process the grievance through Step 3 of the grievance procedure. Quick Air's contention appears to be that the union should have proceeded to Step 4 and requested arbitration before resorting to enforcement of the contract in federal court. It is undisputed, however, that the employer did *not* contest the grievance at Step 3, and as counsel for Quick Air admits, "There are no facts to indicate why a representative (of the company) did not appear (at the hearing before the Joint Committee)." (Plaintiff's Reply Memorandum at p. 7.) Quick Air's failure to appear may well have been because the contract specifically and unambiguously provided for a fifteen cent ($.15) per hour increase effective January 1, 1982, and it is undisputed that the company did not pay the increased rate. Regardless of the reason why the company did not contest the grievance at Step 3 of the grievance procedure, Quick Air's claim that the union nevertheless should have requested arbitration under Step 4 is clearly without merit.

The grievance and arbitration procedures contained in the collective bargaining agreement provide, with reference to Step 3:

> If the Committee resolves the dispute by a majority vote of those present and voting, such decision shall be binding upon all parties.
> The Ohio Joint State Private Carriage and Miscellaneous Contracts Grievance Committee shall have the full power to render a final and binding decision which is not subject to repeal or reopening. *In the event the Ohio Joint State Private Carriage and Miscellaneous Contracts Grievance Committee shall deadlock or fail to render a decision, the provisions of Step 4 shall apply.*

(Emphasis added.) Step 4 provides that "[I]f the grievance is not resolved at the Step 3 meeting," then either of the parties can give notice, within five working days after the meeting, of its intention to submit the matter to an impartial third person for arbitration.

In the present case, the Joint Committee did *not* deadlock—its decision was unanimous. It also did *not* fail to render a decision—it decided, as a result of Quick Air's failure to appear and contest the grievance, that "the benefits of the grievance procedure are withdrawn." While the import of that decision may not be obvious from the somewhat cryptic language used by the Joint Committee, there is evidence before the Court that the Joint Committee intended to award the grievance to the union by default. (Deposition of Keith L. Milburn at pp. 19–20.) Under such circumstances, the union would have no desire to pursue the matter further, and is not required to do so. The union pursued the grievance through Step 3 of the grievance procedures, at which point Quick Air elected not to appear and contest the grievance. The union prevailed under the terms of the grievance and arbitration provision of the collective bargaining agreement, and as a result, had the right to resort to federal court for enforcement of the company's obligation under the contract in a section 301 action.

▪ Compulsory submission of industrial disputes to grievance and arbitration procedures is wholly a matter of contract, *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1959); *Kennecott Copper Corp. v. International Brotherhood of Electrical Workers, Local Union No. 1081*, 339 F.2d 343 (10th Cir.1964). To the extent the union was required to pursue grievance and arbitration procedures under the contract, the Court finds, on the

present state of the record, that the union did so and prevailed at Step 3 of the procedure, when the company failed to appear and contest the grievance before the Joint Committee. Quick Air itself referred to the Joint Committee's decision of February, 1982, as being "the Committee's award in connection with the Union's 15¢ wage grievance." (Plaintiff's Memorandum in Support at p. 5.) The award was clearly not adverse to the union and the union was not required under the provisions of the contract to challenge the "final and binding decision" of the Joint Committee by seeking Step 4 arbitration.

Since the union was not required to proceed to Step 4 of the grievance procedure because it prevailed at Step 3, Quick Air's contention that Local 413's counterclaim should be dismissed for a failure to exhaust the grievance and arbitration procedures is not well taken.

## C. APPLICABLE STATUTE OF LIMITATIONS.

As noted above, Quick Air regarded the Committee's decision of February, 1982, to be "the Committee's award in connection with the Union's 15¢ wage grievance" (Plaintiff's Memorandum in Support at p. 5) and contended that the counterclaim "seeking to enforce that award" was barred by "the 3 months statute of limitation for enforcing arbitration awards set forth in Ohio Revised Code § 2711.13." (Plaintiff's Memorandum in Support at p. 5.)

In *United Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), the Supreme Court, in an action brought by a union under section 301 to enforce the terms of a collective bargaining agreement, followed precedent in applying state statutes of limitation for federal causes of action when the federal legislation in question contains no limitations period. Rejecting the temptation to judicially devise a uniform time limitation for section 301 actions, the Court referred to Indiana's most analogous statute of limitations. Finding that a section 301 action closely resembles an action for breach of

contract, but also finding that proof of the breach and the measure of damages in that case depended upon the existence and duration of separate employment contracts of the individual employees, the Court applied the state's six year statute of limitations governing actions not exclusively based upon a written contract.

In *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981), a discharged employee pursued the grievance procedures of the contract through a binding decision of a joint panel, which upheld the discharge. The employee then brought a "hybrid" section 301 action against his employer and his union. Although the claim against the employer was a section 301 breach of contract claim, the Court noted that the indispensable predicate for such an action by an employee was a demonstration that the union breached its duty of fair representation. In the Court's view, this made the suit more analogous to an action to vacate an arbitration award than to a straight contract action, *Mitchell*, 451 U.S. at 62, 101 S.Ct. at 1563, and applied New York's statute requiring such actions be brought within ninety days of the award. Justice Stewart concurred in the judgment but argued that *Hoosier* did not deal with "hybrid" section 301 actions and that the Court, therefore, was free in *Mitchell* to depart from state statutes to adopt a uniform limitations period in such actions. Justice Stewart found the six month period contained in section 10(b) of the National Labor Relations Act concerning unfair labor practices to be an analogous federal limitations statute which could be uniformly applied in all "hybrid" cases.

Justice Stewart's position in *Mitchell* subsequently prevailed in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), a "hybrid" section 301 action in which the Court concluded, in retrospect, that in such cases state limitations statutes failed to provide the employee with enough time to vindicate his rights under section 301 and the fair representation doctrine.

To remedy this shortcoming, the Supreme Court adopted the six month statute of limitations for allegations of unfair labor practices provided in section 10(b) of the National Labor Relations Act as the governing limitations period in "hybrid" section 301 actions.

In *DelCostello*, the Supreme Court carefully distinguished *Hoosier* based on the nature of the cause of action:

> *Auto Workers v. Hoosier* was a straightforward suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for breach of a collective bargaining agreement by an employer. Unlike the present case, *Hoosier* did not involve any agreement to submit disputes to arbitration, and the suit was brought by the union itself rather than by an individual employee. We held that the suit was governed by Indiana's six-year limitations period for actions on unwritten contracts; we resisted the suggestion that we establish some uniform federal period.

*DelCostello*, 103 S.Ct. at 2289. The Court emphasized that a "hybrid" action—brought by an employee who has exhausted the grievance and arbitration procedures and challenges the adverse result by suing the employer under section 301 and the union for lack of fair representation in the grievance and arbitration procedure—is a different type of action than one for breach of contract brought by the union:

> The [hybrid] suit is thus not a straightforward breach of contract suit under § 301, as was *Hoosier*, but a hybrid § 301/fair representation claim, amounting to "a direct challenge to 'the private settlement of disputes under [the collective bargaining agreement]'" *Mitchell*, 451 U.S. at 66 [101 S.Ct. at 1566] (Stewart, J., concurring in the judgment), quoting *Hoosier*, 383 U.S. at 702 [86 S.Ct. at 1111]. Also, unlike the claim in *Hoosier*, it has no close analogy in ordinary state law.

*DelCostello*, 103 S.Ct. at 2291.

In retrospect, the Court found in *DelCostello* that the analogous state statutes applied by *Mitchell* in hybrid actions suffered "from flaws, not only of legal substance, but more important, of practical application in view of the policies of federal labor law and the practicalities of hybrid § 301/fair representation litigation." *DelCostello*, 103 S.Ct. at 2291. An employee in a hybrid action is often unsophisticated in collective bargaining matters but is required to attempt to evaluate, within the limitations period, the adequacy of the union's representation in the grievance and arbitration proceedings and obtain counsel for a section 301 action. Consequently, the Supreme Court concluded in *DelCostello* that the extremely short periods provided by state statutes governing vacation of arbitration awards—usually ninety days—were too short to give an employee a satisfactory opportunity "to vindicate his rights under § 301 and the fair representation doctrine." *DelCostello*, 103 S.Ct. at 2291.

Neither *Mitchell* nor *DelCostello* detracted from the basic premise of *Hoosier*. As the Court said in *DelCostello*:

> We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy. See, *e.g.*, *Mitchell*, 451 U.S. at 61 n. 3 [101 S.Ct. at 1563 n. 3]. On the contrary, as the courts have often discovered, there is not always an obvious state-law choice for application to a given federal cause of action; yet resort to state law remains the norm for borrowing of limitations periods.

*DelCostello*, 103 S.Ct. at 2294.

The considerations that prompted the Supreme Court in *DelCostello* to forsake analogous state statutes in "hybrid" cases do not apply to actions like the counterclaims in the present case, which are straightforward section 301 actions brought by the union on a claim that the employer has breached a collective bargaining agreement. The contractual counter-

claims are very similar to the straightforward section 301 breach of contract action involved in *Hoosier*. Like *Hoosier*, the counterclaims are asserted by the union itself—not by an unsophisticated employee· —and, like *Hoosier*, the counterclaims do not require allegations of unfair representation as a predicate to the assertion of the claimed breaches of the collective bargaining agreement. The only distinction is that the claims asserted in the present case, apparently unlike those in *Hoosier*, are subject to the grievance and arbitration procedures of the collective bargaining agreement. This distinction only effects the determination of the most analogous state statute to be applied. Inasmuch as the union, on behalf of the aggrieved employees, had to pursue the grievance and arbitration proceedings of the collective bargaining agreement before asserting its claimed breaches of the collective bargaining agreement, the most analogous state statute is one governing actions to confirm arbitration awards, not statutes governing ordinary breach of contract actions.[4]

Quick Air, after correctly distinguishing *DelCostello*,[5] argues that the most analogous limitations periods available are those set forth in the federal arbitration statutes or Ohio's arbitration statutes. The time periods in both sets of statutes are, coincidentally, the same. Both the federal statute, 9 U.S.C. § 9, and the state statute, O.R.C. § 2711.09, provide for a one year period for a party to apply to a court to *confirm* an arbitration award. Both the federal statute, 9 U.S.C. § 12, and the state statute, O.R.C. § 2711.13, provide for a period of three months for any notice of a motion to *vacate, modify,* or *correct* an award. It is not necessary to choose between the federal statutes and the state statutes in this case, however, federal courts generally refuse to borrow the limitations periods set forth in the federal arbitration act. *Derwin v. General Dynamics Corp.,* 719 F.2d 484 (1st Cir.1983); *San Diego District Council of Carpenters v. G.L. Cory, Inc.,* 685 F.2d 1137 (9th Cir. 1982); *Edwards v. Sea-Land Service, Inc.,*

**4.** In *DelCostello,* the Supreme Court stated in a footnote that "even if this action were considered as arising solely under section § 301, the objections to use of state law and the availability of a well-suited limitations period in § 10(b) would call for application of the latter rule," *DelCostello,* 103 S.Ct. at 2287 n. 12. This note referred to the borrowing of a federal limitations period from a general federal statutory scheme when considering a judicially implied cause of action arising from that federal statutory scheme—the position urged by Justice Stewart in *Mitchell* and ultimately adopted by the Court in *DelCostello.* The Supreme Court made this statement in the context of its preceding statement in the footnote that "hybrid" actions "are amalgams, based on both an express statutory cause of action and an implied one," and the Supreme Court's footnote should not be taken as an indication that the six month period of section 10(b) is to be applied to *all* section 301 actions. Although a hybrid action is an amalgam of a statutory action and an implied action, the same considerations that call for a "well-suited limitations period" of six months rather than a state statute of ninety days—the need of an unsophisticated employee to evaluate his claim and retain counsel—would still be present even if the hybrid action is considered more in the nature of a section 301 action than an implied action. Extremely short state statutes of limitation are simply not suitable in such

cases. A straightforward section 301 action by the union based on a breach of contract, however, is not such an "amalgam"; it does not involve any breach of the union's duty of fair representation as a predicate to bringing the action and the analogy of section 10(b) and the unfair labor practice limitation to the union's breach of its duty is simply not present in such a case. In the straightforward breach of contract case, therefore, the most analogous statutes are those state statutes governing breach of contract, as the Supreme Court found in *Hoosier.* When the contract requires resort to the grievance and arbitration procedure, a breach of contract action by the union involving an award in favor of the union would be most analogous to an action seeking to confirm an arbitration award. In the latter case, application of the normally shorter periods contained in state arbitration statutes also is consistent with federal labor policies emphasizing the importance of utilizing grievance and arbitration procedures, as well as the speedy resolution of disputes that have been subjected to those procedures.

**5.** As Quick Air argues, "Obviously, the instant dispute does not involve an employee's claim that the Union breached its duty of fair representation and, thus, *DelCostello* clearly does not apply." (Reply Memorandum, p. 3.) As discussed *infra,* this Court agrees.

678 F.2d 1276 (5th Cir.1982), *reh'g denied,* 685 F.2d 1385 (5th Cir.1982), *vacated on other grounds,* 462 U.S. 1127, 103 S.Ct. 3104, 77 L.Ed.2d 1360 (1983); *Service Employees International Union, Local 36 v. Office Center Services, Inc.,* 670 F.2d 404 (3rd Cir.1982); *Sine v. Local No. 972, International Brotherhood of Teamsters,* 644 F.2d 997 (4th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981); *Chauffeurs Local 135 v. Jefferson Trucking Co.,* 628 F.2d 1023 (7th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981).

■ Quick Air urges the Court to apply the three month limitation period found in the federal act and the Ohio act for actions seeking to "vacate, modify or correct" an award. It is clear, however, that Local 413 is not challenging the decision of the Joint Committee: according to the testimony of Mr. Milburn "the committee had made a decision in our favor." (Deposition of Keith L. Milburn at p. 24.) The most analogous state statute to apply in an action by a union against an employer, in which the dispute arising under the collective bargaining agreement progressed through a binding stage of the grievance and arbitration procedures and ended in a decision favorable to the union, is Ohio's statute governing confirmation of arbitration awards. O.R.C. § 2711.09 sets a limitations period of one year for a party to seek confirmation of an award by a court. That period of time, in the opinion of the Court, complies not only with the established practice of borrowing limitations periods for federal causes of action where Congress has not included a limitation period in the statute itself, but it also is a reasonable period as a practical matter, consistent with national labor policies.[6] *Derwin v. General Dynamics Corporation,* 719 F.2d 484 (1st Cir.1983).

Local 413's counterclaim was filed well within one year from the February, 1982, decision of the Joint Committee and, therefore, is not barred by the governing statute of limitations.

## III. LOCAL 413'S COUNTERCLAIM BASED ON AN ALLEGED FAILURE OF QUICK AIR TO PROVIDE AN INSURANCE PROGRAM EQUAL TO THE PROGRAM ADMINISTERED BY THE OHIO HIGHWAY DRIVERS' WELFARE FUND.

### A. FACTS.

According to affidavits filed by Local 413, Quick Air proposed during the negotiations that culminated in the collective bargaining agreement dated November 26, 1979, that the insurance program for employees be removed from the Ohio Highway Drivers Welfare Fund and reassigned to another company. In connection with that request, Paul A. Smith, Vice-President of Quick Air, wrote the following letter:

TO: ALL DRIVERS

FROM: P.A. Smith

SUBJECT: HEALTH INSURANCE PROGRAM

This will clarify the agreement reached during recent contract negotiations concerning your Health Insurance Program. The Company has guaranteed that it will substitute an insurance program underwritten and administered by an A+ rated insurance company which will be equal to or surpass the current program administered by the Ohio Highway Driver's Welfare Fund. It further agreed that the substituted plan will equal any improvements effected in the comparable Ohio Highway Driver's Welfare Fund when annually updated during the new contract period.

The Company will place the new plan in effect as soon as it is finalized by the insurance company and approved by your Union representatives, probably within the next two months, but before Decem-

---

**6.** The Court emphasizes that its opinion in this respect is limited to the facts and circumstances of this particular case. Under different circumstances, the Ohio statutes in question could conceivably be found to be not analogous or unsat- isfactory vehicles for enforcement of federal law. *DelCostello,* 103 S.Ct. at 2294. *See McPeek v. Dayton Forging & Heat Treating Co.,* 574 F.Supp. 300, 303–04 dictum (S.D.Ohio 1983).

ber 31, 1979. Your current plan will continue until that time.

cc: Teamsters Local 413 Members Negotiating Committee

Paul A. Smith
Vice President

Under the provisions of the Ohio Drivers' Welfare Fund, referred to in Quick Air's letter to its drivers, an employee who retires from work continues to receive full medical coverage for the employee and the employee's spouse, with the exception that dental, vision and life benefits are withdrawn. This coverage continues beyond the expiration of the contract. According to Dorothy J. Froehlich, an employee of Local 413 in charge of administering health and welfare programs:

> In other words, when an individual retires with a company covered by Ohio Highway Drivers Welfare Fund, on the date of retirement that person is vested with medical coverage in spite of subsequent developments between the company and the union regarding collective bargaining agreement or if the company remains in business.

(Affidavit of Dorothy J. Froehlich at p. 2.)

In reliance upon the guarantee of Quick Air that a substituted program would be equal to or surpass the program administered by the Ohio Highway Drivers' Welfare Fund, the union agreed to the substitution of insurance plans. Article 13, Section 1 of the collective bargaining agreement executed on November 26, 1979, provides as follows:

> Effective November 1, 1979, the Company shall provide the comprehensive Health/Welfare plan designed by the Midland Mutual Life Insurance Company, a copy of which is identified as Appendix 1 hereto, at no cost to each of the regular employees on the Seniority Roster. This includes the Comprehensive Dental Care Program submitted by Delta Dental Plan of Ohio, Inc., which is incor-

porated as intregal [sic] to Appendix 1 hereto.[7]

Following the expiration of the contract on July 3, 1982, Quick Air informed Local 413 by letter of August 6, 1982, that the company "will be terminating the Midland Mutual Life Insurance Company Health/Welfare Plan, referred to in Article 13, and will be picking up another policy from a different insurance carrier at lower benefit levels." (Deposition of Keith L. Milburn, Exhibit 6.) These lower benefit levels apparently included termination of all benefits for retirees. Thus Local 413 alleges in the second counterclaim that Quick Air "has refused to comply with the Collective Bargaining Agreement by failing, neglecting, and refusing to provide for medical coverage on those persons who retired under the contract executed on November 26, 1979."

## B. EXHAUSTION OF CONTRACTUAL REMEDIES.

Quick Air contends that Local 413's counterclaim should be dismissed on the ground that the union did not resort to the grievance and arbitration procedures of the collective bargaining agreement before filing its section 301 counterclaim in this Court.

Local 413 asserts this counterclaim on behalf of retirees who are no longer employees of Quick Air. Retirees are an entirely separate class from active employees and possess few of the rights accorded active employees under federal labor law. The employer has no duty to bargain with the union regarding retired employees and may unilaterally modify benefits due them under a collective bargaining agreement without committing an unfair labor practice. *Chemical Workers v. Pittsburgh Plate Glass*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). This does not mean, however, that when a union bargains for benefit due retirees—as Local 413 claims it did in this case—that the retirees are without protection. As the Supreme

7. The attachment identified as Appendix 1 has not been submitted to the Court by either party at this time.

Court stated in *Pittsburgh Plate Glass*, the retirees have a federal remedy under section 301 for breach of contract if the bargained for benefits are unilaterally terminated by the former employer. *Pittsburgh Plate Glass*, 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. It is equally clear that the union has standing to bring such an action on behalf of those retirees: as a signatory to the contract, a union can bring an action for the third party beneficiaries. *Auto Workers of America v. Yard-Man, Incorporated*, 716 F.2d 1476, 1486 (6th Cir.1983).

It was not apparent from the record in *Pittsburgh Plate Glass*, whether the collective bargaining agreement provided for arbitration that would have been applicable to the retirees' dispute in that case, consequently, the Supreme Court expressed no opinion on the relevance of such a provision in this type of an action. *Pittsburgh Plate Glass*, 404 U.S. at 188 n. 24, 92 S.Ct. at 402 n. 24. Compulsory submission of industrial disputes to grievance and arbitration procedures is wholly a matter of contract, *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1959); *Kennecott Copper Corp. v. International Brotherhood of Electrical Workers, Local No. 1081*, 339 F.2d 343 (10th Cir.1964), and the scope and applicability of grievance and arbitration provisions depend upon the language of the agreement.

■ In the present case, the grievance and arbitration provisions in the contract specifically refer to grievances "by the aggrieved employee." The "aggrieved employee" must present his complaint first orally "to his supervisor" who then "orally inform(s) the employee of his decision." If the dispute is not resolved, "the aggrieved employee and the Union Steward" discuss the matter with the supervisor who advises "the employee" and the Steward of his decision. If the employee is not satisfied with that result, the "aggrieved employee" must then reduce his grievance to writing and proceed with further steps under the procedure. It is abundantly clear that the grievance and arbitration procedure of the

contract between Quick Air and Local 413 is designed for and limited to disputes arising between "employees" and management and does not encompass disputes between retirees and management. The plain language of the grievance procedure makes this apparent. As the Supreme Court said in *Pittsburgh Plate Glass*, "the ordinary meaning of "employee" does not include retired workers; retired employees have ceased to work for another for hire." 404 U.S. at 168, 92 S.Ct. at 392.

In addition to the Court's conclusion that the ordinary meaning of "employee" excludes retirees from coverage by the grievance procedure provisions, it is apparent that the procedures themselves do not contemplate that claims will be brought by retirees of the company. For example, the grievance procedures state that within "five (5) working days" after the event occurs on which the grievance is based, the employee "shall first present the same orally to his supervisor." Retirees, of course, have no supervisors. Under the grievance procedures, if the aggrieved employee and his supervisor do not resolve the dispute, "the aggrieved employee and the Union Steward" then discuss the matter with the supervisor. A retiree, however, is not a member of the bargaining unit represented by the union steward, and it is questionable whether there is any obligation or duty on the part of the union to represent retirees, even when the union has negotiated benefits for those retirees in a collective bargaining agreement. *Yard-Man*, 716 F.2d at 1486 n. 16.

■ It is not surprising that the language of the grievance procedure demonstrates that it was confined to the resolution of disputes between active employees and management. The agreement by management for the resolution of grievances through arbitration "is the *quid pro quo* for an agreement not to strike," *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1956), and it is only the active employees who possess this ultimate weapon in collective bargaining. The federal statutes con-

cerning the collective bargaining process and the resolution of industrial disputes are confined to the relationship between active employees and management and *not* those between retirees and the company:

> The inequality of bargaining power that Congress sought to remedy was that of the "working" man, and the labor disputes that it ordered be subjected to collective bargaining were those of employers and their active employees. Nowhere in the history of the National Labor Relations Act is there any evidence that retired workers are to be considered as within the ambit of the collective-bargaining obligations of the statute.

*Pittsburgh Plate Glass,* 404 U.S. at 166, 92 S.Ct. at 391.

Retirees, sitting below the salt at the collective bargaining table, beyond the pale of legislation governing the relationship between active employees and management, are reduced to reliance upon whatever rights they may have as third party beneficiaries of the collective bargaining agreement. In asserting those rights, however, they are not required to resort to the procedures in the agreement designed to resolve disputes of the active employees to avoid strikes. Indeed, as the Sixth Circuit Court of Appeals said in *Yard-Man:*

> Unlike the active employees, retirees face no restrictions whatever in seeking fulfillment of contractual benefits directly from their former employer.

*Yard-Man,* 716 F.2d at 1484–85. In the same decision, although dictum, the Court said:

> ... the very rationale for creating a duty of fair representation—the exclusivity of contractual grievance and arbitration remedies—does not exist in the context of retirees who, without restraint, may litigate their disputes with their former employers directly under § 301.

*Yard-Man,* 716 F.2d at 1486 n. 16.

The Sixth Circuit's strong indication in *Yard-Man* that retirees are not compelled to resort to the grievance and arbitration proceedings of a collective bargaining agreement before proceeding in federal court in a section 301 action for breach of contract is reinforced by its reversal of the District Court in *Metal Polishers Local No. 11 v. Kurz-Kasch, Inc.,* 538 F.Supp. 368 (S.D.Ohio 1982). In that case, the employer, after the collective bargaining agreement expired and the employees went on strike, terminated the medical coverage provided for by the agreement. The union brought an action challenging the termination of that coverage as to the retired employees. The District Court ordered the parties to proceed with arbitration and, following the arbitrator's decision, the court dismissed the federal action. The Court of Appeals reversed and remanded the case to the District Court for further proceedings "consistent with the determination ... that the interpretation of the Collective Bargaining Agreement with respect to the rights of the plaintiffs was not subject to the grievance and arbitration procedures of the contract." *Kurz-Kasch,* 538 F.Supp. at 370.

A plain reading of the collective bargaining agreement between Quick Air and Local 43, in light of the sharp distinction drawn in both statutory and case law between active employees and retirees, leads the Court to conclude that the retirees' claim in the present case that the employer breached the agreement was not subject to the grievance and arbitration procedures of the contract. Therefore, Quick Air's contention that Local 413's counterclaim should be dismissed for a failure to exhaust the grievance and arbitration procedures of the contract is not well taken.

## C. APPLICABLE STATUTE OF LIMITATIONS.

Quick Air contends that the three month limitation contained in Ohio's statute for actions to "vacate, modify or correct" an arbitration award should be applied to Local 413's counterclaim brought on behalf of the retirees. Inasmuch as the retirees were subject to neither the benefits nor the burdens of the grievance and arbitration procedures of the contract covering the active employees of Quick Air, Ohio's stat-

utes dealing with arbitration awards are clearly not the most analogous or appropriate state statutes of limitation. As the Supreme Court noted in *Pittsburgh Plate Glass,* the remedy for retirees whose contractual benefits have been affected by unilateral action of their former employee is a section 301 action for breach of contract. *Pittsburgh Plate Glass,* 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. This is exactly the type of action asserted by Local 413's counterclaim: it is not a "hybrid" section 301 action like *DelCostello;* instead it is a straightforward action for breach of contract—very similar to the action brought in *Hoosier.*

In *Hoosier,* the employer terminated the employment of union members and failed to pay any of the accumulated vacation pay to which the employees were entitled under the terms of the collective bargaining agreement. As the Court appropriately noted:

> The present suit is essentially an action for damages caused by an alleged breach of an employer's obligation embodied in a collective bargaining agreement. Such an action closely resembles an action for breach of contract cognizable at common law.

*Hoosier,* 383 U.S. at 705 n. 7, 86 S.Ct. at 1113 n. 7. Accordingly, the Supreme Court applied Indiana's statute of limitations governing actions based on breach of contract. Inasmuch as proof of the breach and of the measure of damages (vacation pay) depended upon the existence and duration of individual employment agreements, the Court found that it was more appropriate to apply the Indiana statute governing contracts not in writing rather than the Indiana statute governing contracts in writing. The Court noted, however, that

> There may, of course, be § 301 actions that can only be characterized fairly as based exclusively on a written agreement.

*Hoosier,* 383 U.S. at 707, 86 S.Ct. at 1114.

▮▮▮ If the counterclaim brought on behalf of the retirees is characterized as based exclusively on the written collective bargaining agreement, the Ohio statute governing actions on written contracts, O.R.C. § 2305.06, which provides a fifteen year period of limitations, is the most analogous state statute. If the counterclaim is based on a contract not exclusively in writing or upon a liability created by statute (*e.g.,* section 301), Ohio's six year statute, O.R.C. § 2305.07, is the applicable statute. If characterized as an action based on allegedly fraudulent conduct of Quick Air, the Ohio statute providing a four year statute of limitations for fraud and injuries not arising on contract, O.R.C. § 2305.09, is applicable. It is not necessary to select, in this case, the most analogous of these state statutes, because the counterclaim in the present case was timely under any of these state statutes and, therefore, was not barred by any analogous statute of limitations.

## D. OTHER ALLEGED DEFENSES TO THE COUNTERCLAIM.

Quick Air asserts other arguments in support of its motion to dismiss or for summary judgment on the counterclaim, which, in the context of the motion and on the present state of the record, can be resolved rather quickly.

### 1. The argument that the collective bargaining agreement does not provide for insurance coverage for retirees.

Initially, it should be noted that the entire collective bargaining agreement has not been presented to the Court. Article 13, Section 1, dealing with health insurance, refers to the plan designed by the Midland Mutual Life Insurance Company, a copy of which was apparently attached to the original agreement as Appendix 1 but has not been submitted to the Court. Even if that plan does not provide coverage to retirees, the thrust of the counterclaim is the alleged breach by Quick Air of its guarantee that the Midland Mutual plan would be equal to or surpass the plan of the Ohio Highway Drivers' Welfare Fund, which apparently *did* provide such coverage to re-

tirees. In short, this is not a case in which the Court must attempt to interpret and construe ambiguous language in the agreement to determine whether it was intended to provide such coverage to retirees after the contract had expired, *see Upholsterers Union v. American Pad & Textile Co.*, 372 F.2d 427 (6th Cir.1967); *Metal Polishers Local No. 11 v. Kurz-Kasch*, 538 F.Supp. 368 (S.D.Ohio 1982); instead, it is a case in which it is alleged that the company expressly agreed to provide such coverage but breached its written guarantee to do so.

2. **The arguments that Quick Air was legally entitled to terminate insurance coverage after an impasse occurred in the bargaining, the agreement expired, and the employees went on strike.**

 Quick Air's arguments in this regard miss the point of the counterclaim. Whatever rights Quick Air had to terminate the insurance provided to the active employees after the contract expired and those employees went on strike, the thrust of the counterclaim is that Quick Air guaranteed that the insurance provided would be equal to a comparable plan whereby, upon retirement, an employee "is vested with medical coverage in spite of subsequent developments between the company and the union regarding collective bargaining or if the company remains in business." (Affidavit of Dorothy J. Froehlich at p. 2.) It is well recognized, of course, that a retiree's vested benefits may extend beyond the term of the collective bargaining agreement. *Yard-Man*, 716 F.2d 1476. Depending upon the evidence presented, those employees who retired during the term of the collective bargaining contract in the present case may well be entitled to the continued coverage allegedly promised by their employer. Neither the Midland Mutual plan nor the Highway Drivers' Fund plan is presently before the Court, and the Court does not have all of the evidence concerning the alleged promise of Quick Air; therefore, the Court expresses no opinion regarding the merits of the counterclaim under consider-

ation. The Court is of the firm opinion, however, that the allegations of the counterclaim, the affidavits submitted by the union and the deposition testimony and exhibits of Mr. Milburn compel the conclusion that Quick Air's motion to dismiss the counterclaim or for summary judgment thereon must be denied.

For the reasons stated above, plaintiff's motion to dismiss, or in the alternative, for summary judgment is DENIED.

IT IS SO ORDERED.