**Ronald SINE and Larry Danner,
Appellants,**

v.

**LOCAL NO. 992 INTERNATIONAL
BROTHERHOOD OF TEAMSTERS;
Eastern Conference of Teamsters; and
Mitchell Transport, Inc., Appellees.**

**No. 79–1625.**

United States Court of Appeals,
Fourth Circuit.

Argued June 3, 1980.

Decided March 24, 1981.

998

Harry Goldman, Jr., Baltimore, Md., for appellants.

Jonathan G. Axelrod, Bethesda, Md. (Hugh J. Beins, Washington, D. C., on brief), for appellees Eastern Conference of Teamsters.

Roger D. Susanin, Bala Cynwyd, Pa. (Alfred J. D'Angelo, Cunniff, Bray & Mc-Aleese, Bala Cynwd, Pa., on brief), for appellees Mitchell Transport, Inc.

Thomas H. Kohn, Alexandria, Va., on brief, for appellees Teamsters Local 992.

Before HAYNSWORTH, Chief Judge, WIDENER, Circuit Judge, and HOFF-MAN, Senior District Judge.*

* United States District Court for the Eastern District of Virginia.

WIDENER, Circuit Judge:

This controversy comes before us for a second time. The plaintiffs, Ronald Sine and Larry Danner, have brought suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the United States Arbitration Act, 9 U.S.C. § 1 et seq., against their employer, Mitchell Transport, Inc. (Mitchell or Company), Local 992 of the International Brotherhood of Teamsters (Local), and the Eastern Conference of Teamsters (Conference). Sine and Danner are seeking to vacate an arbitration decision denying their claims for back pay against the Company. Additionally, they allege that the Unions breached their duty of fair representation in not properly or adequately advancing their claims against Mitchell. From summary judgment for the defendants, plaintiffs appeal. We affirm the district court's denial of the claim to vacate the arbitration award, but vacate the summary judgment on the claims for breach of the duty of fair representation and remand that matter to the district court for further consideration.

The facts surrounding this dispute are somewhat involved and thus require a rather detailed account. Mitchell is an interstate common carrier, engaged primarily in hauling cement. It maintains a number of terminals throughout the United States, only two of which are pertinent here, one in Union Bridge, Maryland and another in Baltimore.[1]

In the spring of 1971, Mitchell transferred seven of the twelve tractors at the Baltimore facility to Union Bridge because of a change in customer demands. The transfer meant a loss of job opportunities at Baltimore and increased the work available at Union Bridge. The Company posted what is called a "sign-up bid" list at Baltimore, which allowed the Baltimore drivers to volunteer to transfer to Union Bridge. The transfer called for terminal seniority

1. The Baltimore terminal is no longer operational.

for purposes of dispatch but company seniority whenever layoffs occurred. Five of the Baltimore drivers, including the present plaintiffs, signed the list and transferred to Union Bridge. They were placed at the bottom of the driver seniority list for job selection at Union Bridge in accordance with § 5.7 of the Eastern Area Cement Haul Agreement,[2] the collective bargaining agreement.

During the summer of 1971, a dispute arose at Union Bridge regarding the seniority of the newly transferred drivers from Baltimore. The original Union Bridge drivers objected to the floating seniority of the transferees, who could exercise their company seniority whenever they were laid off.[3] As a result of that dispute, the Local 992 union steward at the terminal, hoping to clear up the situation, filed a grievance with the Union. The grievance, which noted that two high seniority and three low seniority Baltimore drivers had transferred to Union Bridge, asserted that the original Union Bridge drivers were being denied their full working opportunities. It requested that all five drivers be returned to Baltimore because work was available for them there.

The grievance was heard before the Eastern Area Tank and Cement Haul Joint Committee, an arbitration panel established by the collective bargaining agreement, whose decisions, according to the agreement, are final and binding.[4] The Joint Committee, in Case No. 839, determined that only those employees who were forced to transfer to Union Bridge because of a loss of work at Baltimore were entitled to exercise floating seniority. Thus, the decision upheld only the right of the three junior drivers to transfer to Union Bridge, which group included the present plaintiffs. The decision required the Company to re-post a list at Baltimore and required the senior drivers to return to Baltimore at the soonest practical opportunity.

In October 1971, the five former Baltimore drivers had meetings with representatives of the Company and the Union. The original Union Bridge drivers wanted all the Baltimore drivers to return to Baltimore; none of the Baltimore drivers, however, wanted to return. In the end, each of the Baltimore drivers, including the plaintiffs Sine and Danner, signed a letter in which he agreed to accept terminal rather than company seniority, except for fringe

---

2. Section 5.7 of the collective bargaining agreements, from March 1, 1974 through February 28, 1977, provided in pertinent part:

(b) Closing of branches, terminals, divisions or operations:

\* \* \* \* \* \*

(2) .... Such employee, however, shall go to the bottom of the seniority board and shall have the right of job selection only in accordance with the seniority at such terminal. However, he shall exercise his Company seniority for layoff purposes and other contract benefits.

Effective March 1, 1977, § 5.7 was changed to provide for virtually complete dovetailing of seniority rosters:

(b) Closing of branches, terminals, divisions or operations:

\* \* \* \* \* \*

(2) .... Such employee, however, shall be dovetailed in accordance with procedures outlined in Article 5, Section 5.5.

Section 5.5 calls for dovetailing of the active rosters and dovetailing of the inactive rosters. When someone moves from inactive to active, he is dovetailed into the active roster with full company seniority.

3. A Company representative had interpreted § 5.7 to mean that once a transferee driver had not worked on a consecutive Thursday, Friday, and Saturday, that represented a layoff for purposes of the contract and he could then exercise his Company seniority and thus work where an old Union Bridge employee with greater terminal seniority, but less company seniority, would not work. Because of that interpretation, a number of the original Union Bridge drivers, in order to protect their seniority, stayed out of work on a Thursday to prevent the Baltimore drivers from obtaining layoff status because the Company was forced to depend on the Baltimore drivers in the absence of the Union Bridge drivers who had stayed out.

4. The Joint Committee consists of three (or other equal number of) representatives of the Company and three of the Union. A majority of the Committee is required to rule on a grievance; in the event of a deadlock, the grievance is submitted to an impartial arbitrator, whose decision is also final and binding. See §§ 7.3 and 7.5 of the collective bargaining agreement.

benefits, in return for the right to remain at Union Bridge.

Some six months later, around May of 1972, Sine and Danner were both laid off. Subsequently, both filed grievances requesting company seniority for purposes of layoffs, and the dispute was brought before the Joint Committee as Case No. 1007. The plaintiffs argued that the letter they had signed forfeiting their entitlement to floating seniority was null and void.[5] The Committee, however, rejected their contention; "Based upon the facts presented including the letter dated November 10, 1971, which was executed by the parties, the grievance is denied."

Following that decision, Sine and Danner, in July 1973, brought suit in the District of Maryland against the Local and the Company, seeking damages and injunctive relief restoring their company seniority. On June 6, 1975, the jury returned a verdict in favor of the plaintiffs against both defendants and awarded Sine $14,000 and Danner $11,-000 in damages. With regard to the claim for injunctive relief, however, the court, in a letter dated October 29, 1975, advised that it was denying the plaintiffs' claim:

> After reviewing the instructions, the evidence, and the pretrial order I find nothing in the jury's verdict that would require or justify the issuance of injunctive relief as requested by the plaintiffs. The actions of the parties are controlled by various union agreements and those agreements set forth the procedures to be followed in enforcing the rights of all parties. This enforcement neither requires nor justifies Court intervention based upon the jury's verdict.

The court filed a formal order denying injunctive relief on October 31, 1975.

In July 1975, prior to the court's denial of the requested injunctive relief, Sine and Danner once again filed grievances asking for their rightful company seniority and back pay from June 6, 1975, the date of the jury verdict. These grievances were heard together before the Joint Committee as Case No. 1384. The Union's attorney assisting Sine and Danner contended that not only was the letter null and void as an extra-contractual agreement, but also that the grievants were never aware of Case No. 839, and that fact negated the letter. The Committee, however, in its decision issued in November 1975, denied the grievance with respect to both the seniority rights and back pay.[6] Sine and Danner made no attempt to vacate that decision of the Joint Committee.

On December 3, 1975, the Local signed a consent order in which it agreed to observe the company seniority of the plaintiffs for daily dispatch purposes. The Company was not a party to that order which was entered by the district court.

On March 10, 1977, this court, in an unpublished opinion, affirmed the plaintiffs' jury verdict against the Company and the Local. We held:

> There is sufficient evidence in this case to support the jury's verdict and to show both a breach of the collective bargaining agreement by Mitchell and unfair representation of Sine and Danner by the union.
>
> The letter signed by the Baltimore drivers did not operate as a waiver because a waiver is an intentional relinquishment of a known right. Here, there is a firm basis for a finding by the jury that Sine and Danner were not adequately informed of their rights, and, hence, under accepted principles of contract law, did not waive their rights.

*Sine v. Mitchell Transport, Inc.*, No. 76–1201 (4th Cir. March 10, 1977), at 4–5.

---

5. They argued it was null and void pursuant to § 6.2 of the collective bargaining agreement:

   The Employer agrees not to enter into any agreement or contract with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

6. "Based upon the facts presented with respect to the grievants' claim for back pay including interest, the grievance is denied.

   "Based upon the facts presented with respect to the grievants' claim for seniority rights, the grievance is denied."

Shortly after this court's affirmance of the jury's award, Sine and Danner again filed a grievance seeking back pay and seniority. This grievance went before the Joint Committee as Case No. 1524, and the Committee this time deadlocked on the vote, thus sending the matter to arbitration pursuant to the applicable provisions of the collective bargaining agreement.[7]

The arbitrator held, contrary to the jury's determination and contrary to that of this court, that Sine and Danner waived their rights to company seniority when they signed the letter. He thus denied the grievance with regard to the claim for back pay. However, with regard to the claim for seniority, the arbitrator upheld the grievance for equitable reasons and directed that Sine and Danner be dovetailed into the roster at Union Bridge in accordance with their company seniority. (The collective bargaining agreement which became effective on March 1, 1977 had altered the transfer policy and provided for complete dovetailing of rosters whenever there was a transfer of work from one terminal to another.) Because the Baltimore terminal had been closed and the newly transferred drivers with less company seniority would bump Sine and Danner, the arbitrator decided that the plaintiffs should be granted full seniority rights. The arbitrator issued his decision on August 22, 1978, and it was received at the Eastern Conference of Teamsters on August 24, 1978.

Still dissatisfied, Sine and Danner filed this suit under the Labor Management Relations Act and the United States Arbitration Act against the Company, the Local, and the Conference. The plaintiffs sought to vacate the arbitrator's award on the theory that the earlier jury verdict and this court's affirmance of the award should be accorded res judicata effect and thus require a finding that they receive back pay. They also contended that the Unions breached their duty of fair representation, alleging that the Unions did not present a thorough case, that the Unions failed to urge the arbitrator to render a more expeditious decision, and that the Unions were responsible for the delay in the resolution of the dispute. On cross motions for summary judgment, the district court granted the defendants' motions and denied the plaintiffs'. The court rejected the plaintiffs' contention that its prior determination be given res judicata effect. The court granted the Company's motion on the ground that the plaintiffs' claim was barred by the appropriate statute of limitations found in the Uniform Arbitration Act effective in Maryland, Md. Code, Courts and Judicial Proceedings, § 3–201 et seq., which provides for a thirty day period to set aside an award. Finally, the court granted the Unions' motions, saying that the plaintiffs' claims were groundless and had been discredited in the plaintiffs' own words.[8] This appeal followed.

■ The first issue for consideration is whether the plaintiffs' claim against the defendant Mitchell is barred, as the district court held, by the thirty day limitations' period provided for in the Maryland Uniform Arbitration Act. The plaintiffs brought this action to vacate the arbitrator's award under the United States Arbitration Act and § 301 of the LMRA, 29 U.S.C. § 185.[9] The United States Arbitra-

---

7. See Note 4 supra. The plaintiffs also contend that the Union representatives on the Committee voted to deadlock only because of a threatening letter sent to the Committee by the plaintiffs' counsel.

8. Because of the manner in which it disposed of the case, the district court did not pass upon other defenses urged by the Unions or the Company, as we do not. Of course, those applicable to the Unions may be considered on remand.

9. The plaintiffs' claim of jurisdiction under the United States Arbitration Act, 9 U.S.C. § 1 et seq., is not well taken. This statute does not furnish jurisdiction; rather, it requires an independent base for it. 9 U.S.C. § 4 provides for relief in a district court which "would have jurisdiction under Title 28" "save for such [arbitration] agreement," and this provision has been correctly literally construed. E. g. *Commercial Metals Co. v. Balfour, Guthrie, & Co. Ltd.*, 577 F.2d 264 (5th Cir. 1978); *Metro Industrial Painting Corp. v. Terminal Const. Co.*, 287 F.2d 382 (2d Cir. 1961). Nevertheless, we

tion Act provides for a three month limitations' period for a suit to vacate or modify an arbitration award. 9 U.S.C. § 12. However, the act also expressly states that it is inapplicable to actions concerning contracts of employment of workers engaged in interstate commerce, 9 U.S.C. § 1, and this court has held that the exclusionary provision applies in cases such as the one before us here. *United Electrical Radio & Machine Workers of America v. Miller Metal Products, Inc.*, 215 F.2d 221 (4th Cir. 1954); *International Union United Furniture Workers of America v. Colonial Hardwood Floor Co.*, 168 F.2d 33 (4th Cir. 1948). Mitchell is an interstate carrier, and this dispute concerns the collective bargaining agreement. Thus, the United States Arbitration Act and its three month statute of limitations has no direct application in this case.

■ Although some courts have looked to the limitations' period provided for in the United States Arbitration Act for actions to vacate an arbitration award, see, e. g., *Communication Workers of America v. Pacific Telephone & Telegraph Co.*, 462 F.Supp. 736 (C.D.Cal.1978), others have looked to State law for the appropriate limitations' period. See, e. g. *Wallace v. American Telephone and Telegraph Co.*, 460 F.Supp. 755 (E.D.N.Y.1978). *International Union (UAW) v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), requires us to look to State law for determination of the limitations' period for a claim under 29 U.S.C. § 185. Additionally, we are required under *Campbell v. City of Haverhill*, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed.2d 280 (1895), to follow the Rules of Decision Act, 28 U.S.C. § 1652, in determining which statute of limitations to apply. Under that statute the "laws of the several states, except where . . . Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of

the United States . . . ." In this case Congress has not provided for a limitations' period for actions under § 301 to vacate an arbitration award, and has specifically excluded the application of the United States Arbitration Act to actions concerning such collective bargaining agreements. Thus, given that Congress has not provided otherwise, we look to the law of Maryland to determine the appropriate limitations' period.

■ The State statute of limitations to be selected is determined by characterizing the nature of the § 301 suit. *Hoosier Cardinal*, supra. Because this action against the Company is one which requires the vacation of an arbitrator's award, we characterize the suit as one to vacate an award and look to the applicable arbitration statute of the State for limitations of the action. E. g. *Barbarino v. Anchor Motor Freight, Inc.*, 421 F.Supp. 1003, 1006 (W.D.N.Y.1976), and cases there cited; *Wallace*, supra, and cases there cited. This holding gives effect to the national labor policy of deciding labor disputes by arbitration if possible. *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Section 3–224 of the Maryland Code, Courts and Judicial Proceedings provides for a thirty day limitations' period:

(a) *Petition*—(1) Except as provided in paragraph (2), a petition to vacate the award shall be filed within 30 days after delivery of a copy of the award to the petitioner.

(2) If a petition alleges corruption, fraud, or other undue means it shall be filed within 30 days after the grounds become known or should have been known to the petitioner.[10]

The award here was issued on August 22, 1978, and the Local's attorney forwarded a copy of the opinion and award to the plain-

---

reach the merits of the applicability of the United States Arbitration Act, for the district court "save for . . . [the arbitration] agreement" had jurisdiction under 29 U.S.C. § 185(a).

**10.** There is no merit to plaintiffs' argument that *Howard v. Aluminum Workers International*

*Union*, 589 F.2d 771 (4th Cir. 1978), requires a three year limitations' period be applied here for actions based upon tort. The case did not involve the vacation of an arbitration award. Rather, it was only a § 301 action against a union for a breach of the duty of fair representation.

tiffs' counsel on August 24, 1978. The district court found that the plaintiffs became aware of the outcome no later than September 1, 1978, and the plaintiffs do not challenge that finding on appeal. Plaintiffs filed the present action on November 20, 1978, which is more than thirty days after they received the award; thus, the action is untimely under Md.Code, Courts and Judicial Proceedings, § 3–224(a)(1).

Although the plaintiffs allege that the arbitrator's decision was "tainted with corruption," they do not contend that they filed this action within thirty days of learning of the alleged corruption; indeed, the record would not support such a contention.[11] Thus, they cannot come within § 3–224(a)(2) of the Maryland Act in order to avoid the bar of the thirty days' limitation period even if fraud was involved as alleged (but which is not shown by the present record).

Because the claim is barred by the statute of limitations, we need not consider the plaintiffs' argument that the earlier decisions of the district court and this court should be given res judicata effect.

■ We now consider whether the district court erred when it granted summary judgment against the plaintiffs on their claim against the union for breach of the duty of fair representation. In their complaint, the plaintiffs alleged that the breach consisted of, among other things,

hindering, delaying and postponing the plaintiffs' Grievance Procedures at each and every stage, and, only after threat of suit from plaintiffs' private attorney, grudgingly years late, deadlocking the final step of the Grievance procedure before Arbitration, so as to require said Arbitrator, who was either incompetent or corrupt, or both, was mal-selected by the parties, failing to advance and argue the simple and legal, factual premises from the trial record, prayers and instructions, court charge, briefs of the parties, record on Appeal and Opinion, in the United States Court of Appeals for the Fourth Circuit, waiving and permitting the delay of his Decision for 10 months and 22 days, so that the amount of back pay which the Arbitrator should have awarded to the employees, would have made an Award of back pay even more costly, from which the Arbitrator obviously shrank, and other breaches of the aforesaid Union's duty of fair representation, were by it committed.

The district court stated that the essence of the plaintiffs' claim against the Union was that the "Local 992's attorney did not present a 'thorough' case, that the Union failed to urge the arbitrator to render a more expeditious decision, and that the Union was somehow responsible for the lengthy delay in the issuance of the arbitrator's final decision." The court did not detail the evidence but held that many of the plaintiffs' allegations were totally groundless, as well they may have been, based on what it described as a detailed and thorough refutation by the defendants and by the plaintiffs' own words. The other allegations, the court held, did not amount to arbitrary or discriminatory behavior by the attorney or any dishonest conduct on the part of the Union. The district court thus granted the defendants' motion for summary judgment on the breach of duty claim.

The plaintiffs have raised a number of factual allegations, and some of the facts

---

11. See Sine's deposition testimony:
Q. ... I want to know when in your own mind you reached the decision that the arbitrator is corrupt?
A. After I got the decision.
Q. Okay. Now, how much after.
A. When I got it.
Q. When you got—
A. Yes.
Q. —and read it, you reached that conclusion—
A. Right.
Q. —correct?

A. Right. When we got the reason for not giving it.
See also Danner's deposition testimony:
MR. GOLDMAN: Go ahead. When did you reach a conclusion that the arbitrator was corrupt after you got the decision?
THE WITNESS: After I got the decision or read it. I felt—
BY MR. SUSANIN:
Q. As soon as you became aware of the decision?
A. Yes. I would say that there.

we are now asked to consider might arguably have been considered by the district court to prove that the Unions' conduct was arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967). While the district court did relate a few of the facts in part, we are unable to ascertain from its opinion just what facts it relied upon for determining that the plaintiffs' claim against the Unions was without merit. We feel that this is a case where the district court did not undertake a critical review of the relevant facts so as to give support to its conclusory findings. *Lewis v. Tobacco Workers' International Union*, 577 F.2d 1135, 1146 (4th Cir. 1978). Accordingly, the judgment of the district court with respect to the § 301 claim against the unions for breach of the duty of fair representation is vacated and remanded for reconsideration by the district court.[12] On remand, the district court may consider the case on the record before it, or may, within its discretion, consider further factual development if it be so advised.

*AFFIRMED IN PART, VACATED AND REMANDED IN PART.*

---

**12.** The district court, because it determined that the plaintiffs' claim for breach of the duty of fair representation was without merit, did not decide whether the Conference, independently of the Local, owed such a duty to the plaintiffs. On remand, if the court should determine that the plaintiffs' claim does have merit, it should also consider whether the plaintiffs may seek recovery from both the Local and the Conference.