43 F.3d 1467
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PEOPLE KARCH INTERNATIONAL COMPANY, LIMITED, Plaintiff-Appellant,
v.
Elaine PEULER; Tony Demaio; Team Fit Incorporated,
Defendants-Appellees.
 No. 94-1144.
 United States Court of Appeals, Fourth Circuit.
 Argued: Sept. 27, 1994.
Decided: Dec. 15, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-93-708)
 ARGUED: James Aston Barker, Jr., GREEN, STEWART & FARBER, P.C., Washington, D.C., for Appellant. Timothy Brooks Hyland, DUFF & LEFFLER, P.C., Fairfax, VA, for Appellees. ON BRIEF: Allen V. Farber, GREEN, STEWART & FARBER, P.C., Washington, DC, for Appellant.
 E.D.Va.
 AFFIRMED IN PART AND VACATED AND REMANDED IN PART.
 Before RUSSELL and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 People Karch International Company ("PKI") appeals from several adverse portions of a judgment entered in its basically successful diversity action against defendants Elaine Peuler, Tony DeMaio, and Team Fit, Inc. ("TFI"), claiming fraud, breach of contract, conversion, and breach of fiduciary duty. We affirm in part, vacate and remand in part for further proceedings.
 
 
 2
 * PKI is a Delaware corporation with its main offices in Virginia; Robert Karch is the President and minority owner of PKI, and People Company International is the majority owner. Peuler and DeMaio are California residents and President and Vice President of TFI respectively. TFI was a California corporation in the business of designing and selling computer systems.
 
 
 3
 In late 1992, PKI became interested in TFI's business, and began negotiating a purchase of TFI's assets as early as January 1993. In January 1993, Karch met with Peuler and DeMaio for the purpose of getting to know them, evaluating their integrity, and determining whether anything in their backgrounds would render them unsuitable for future employment with PKI after the asset purchase. During this meeting, Peuler revealed that she was involved in a lawsuit against a former employer. However, DeMaio failed to reveal his 1986 felony conviction for fraudulently falsifying documents.
 
 
 4
 Also during this meeting, DeMaio and Peuler provided information to PKI concerning TFI's assets, liabilities, revenues and expenses, anticipated revenues and expenses, sales, and projected sales. PKI also had access to TFI's books and records. As it later developed, the liabilities were understated by at least $100,000.
 
 
 5
 During January, February, and March 1993, DeMaio and Peuler sent a series of letters to PKI. The first stated that, if PKI would give TFI $300,000, TFI could use it to generate $1,500,000 in new sales. From January to May, PKI did give TFI (later, "Team Fit division" of PKI) $415,735, but few, if any, new sales were generated. In the second letter, DeMaio stated that five "new deals" had been made, and in a third letter he stated that five new computer systems had been sold. Both of these statements were false; in reality, no new deals or sales had been made.
 
 
 6
 Prior to April 2, 1993, PKI advanced $233,559 to the defendants, and guaranteed a lease for them. In addition, the parties entered into a Line of Credit Loan Agreement, according to which all amounts advanced to the defendants were to be repaid by August 26, 1993.
 
 
 7
 The negotiations culminated in PKI's entering an Asset Purchase Agreement on April 2, 1993, between TFI, Peuler, and DeMaio. By this agreement, PKI purchased TFI's assets, including its accounts receivable, which were worth approximately $40,000 at that time. The assets became the property of Team Fit Division of PKI. PKI also entered into Employment Agreements with DeMaio and Peuler, by which they assumed the titles of, respectively, General Manager and Executive Vice President of Team Fit division. They also both became Vice Presidents of PKI. They reported to Karch, and their duties could be modified by PKI.
 
 
 8
 Peuler and DeMaio admitted that they knew they owed fiduciary duties to PKI. Despite this, Peuler and DeMaio directed Team Fit employees not to cooperate with PKI and to withhold information from PKI. In addition, although PKI had instructed DeMaio and Peuler in April that bills should go out in the name of "the Team Fit division of PKI" rather than TFI, by early May, the defendants had sent three invoices in the name of TFI. One customer paid them $4,000, another customer paid $5,500, and a third customer paid $10,000. With DeMaio's approval, Peuler used two of the payments to make payments on her personal credit card. DeMaio and Peuler together spent the third amount on personal expenses. They never reported these activities to PKI, and, when confronted by a PKI official, Peuler even denied one incident until shown the letter she had sent to the customer.
 
 
 9
 In late April, Rick Kreter, a PKI consultant, requested that DeMaio provide financial justification for a color photocopier and for new office furniture. DeMaio told him that they were both being provided on a free trial basis, which was false, and that the furniture would cost $1,000 per month if leased, when in fact it would cost at least $2,100 per month. Also in April, Kreter and others instructed DeMaio to limit hiring of support personnel; instead of doing so, DeMaio hired new workers within a few days.
 
 
 10
 On April 29, Kreter recommended that DeMaio be fired for mismanagement and poor performance, as provided by the employment agreement, but Karch decided to give him another chance. Karch sent DeMaio both a letter regarding his deficiencies and an "Action Plan" that included various directions for corrective action and reporting procedures, none of which DeMaio obeyed. DeMaio and Peuler failed to comply with internal reporting procedures and to provide requested plans for corrective action in the areas of marketing, sales, and operations. Then, in addition to contacting People Company, the majority owner of PKI, without Karch's or PKI's knowledge or permission, they made an inadequate presentation to Karch's superiors at People Company and disparaged Karch and other PKI executives during the presentation. They also made disparaging remarks to Team Fit employees about PKI senior officials.
 
 
 11
 By late May, Karch, Kreter, and other senior PKI officials became aware of much of the foregoing, including DeMaio's criminal conviction, DeMaio and Peuler's disloyal activities, their having instructed Team Fit employees to be uncooperative with PKI, and their failure to report activities with clients. Based on this information, PKI terminated Peuler and DeMaio for cause on June 1, 1993. After being terminated, DeMaio changed locks on Team Fit premises, thereby preventing PKI access to the premises and its assets enclosed within.
 
 
 12
 PKI then brought this action against DeMaio, Peuler, and TFI, alleging breach of the Employment Agreement, breach of the Asset Purchase Agreement, breach of the Loan Agreement, breach of fiduciary duty, conversion, and fraud and seeking compensatory and punitive damages. The defendants counterclaimed, alleging breach of the Employment Agreement and the Asset Purchase Agreement. Following a bench trial, the district court found in favor of PKI on its con version claims, its breach of Employment Agreement claim, its claim of nonpayment under the Loan Agreement, and its claim for attorney fees under the Asset Purchase Agreement, but found against PKI on its fraud and breach of fiduciary duty claims, and, though it had found for PKI on its claim for breach of the Employment Agreement, declined to award damages on this claim, and did not address the claim for punitive damages. The court found against defendants on their counterclaims for breach of the Employment and Asset Purchase Agreements and dismissed them. The resulting judgment awarded PKI a total of $367,500, made up of the following items: $19,500 for conversion of accounts receivable; $40,000 for conversion of equipment and other tangible property; $75,000 for contractual attorney fees; and $233,000 for the balance owed under the Loan Agreement.
 
 
 13
 PKI then took this appeal in which it challenges the district court's rejection of its fraud and breach of fiduciary duty claims, its failure to award any compensatory damages on its breach of Employment Agreement claims, and its failure to address the issue of punitive damages on its conversion claims.
 
 II
 
 14
 Before turning to the substantive issues, we address briefly a problem raised by the failure of DeMaio, a named appellee against whom relief is sought on this appeal, to file a brief, either jointly or individually, or to participate in oral argument. TFI and Peuler filed a joint appellees' brief in which they state that "the discussion throughout this Brief will relate primarily to those facts and issues involving Peuler and TFI. Except where expressly stated otherwise, this Brief will not address matters ... solely involving DeMaio." Appellees' Br. at 2.
 
 
 15
 Under these circumstances, we could, upon request, allow the appellee nevertheless to participate in oral argument or, failing that, simply decide the issues affecting his interests on the basis of the appellant's brief and oral argument. Fed.R.Civ.P. 31(c). See Allgeier v. United States, 909 F.2d 869, 871 n. 3 (6th Cir.1990). As indicated, DeMaio did not participate in oral argument (nor request permission to do so). Accordingly, we consider the issues affecting DeMaio's interests on the basis of the appellant's brief and oral argu ment and, to the extent the appellees' interests are identical, on the basis of the joint brief filed by Peuler and TFI. Cf. Childs v. Kaplan, 467 F.2d 628, 629 (8th Cir.1972) (appellant's appeal not dismissed despite his failure to file a brief because another appellant who challenged the identical issues did file a brief).
 
 III
 
 16
 We first consider PKI's challenge to the district court's dismissal of its fraud claims. As indicated in our statement of the case, these claims were based on two alleged misrepresentations: the affirmative statements regarding TFI's financial situation and the failure of DeMaio to disclose his prior felony conviction. We will take these in turn, after briefly reviewing the familiar elements of the tort of fraudulent misrepresentation.
 
 
 17
 Under Virginia law, which controls in this diversity case, the elements are: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Winn v. Aleda Constr. Co., 315 S.E.2d 193, 195 (Va.1984); Elliott v. Shore Stop, Inc., 384 S.E.2d 752, 756 (Va.1989). These elements must be proved by clear and convincing evidence, rather than by a mere preponderance of the evidence. Winn, 315 S.E.2d at 195; Elliott, 384 S.E.2d at 756.
 
 
 18
 * Despite finding (1) that DeMaio and Peuler had provided information to PKI about TFI's liabilities that turned out to be understated by more than $100,000; (2) that DeMaio and Peuler expected that PKI would rely on this information; (3) that DeMaio and Peuler had estimated that they could turn a $300,000 investment by PKI into $1.5 million in new sales which never materialized; and (4) that DeMaio had falsely represented that five new deals or sales had been made, J.A. at 661-62, the district court concluded summarily that "PKI failed to demonstrate fraud on the part of the defendants." J.A. at 669. The court gave as its only specific reason for this conclusion, without relating it to any of the specific elements of fraud, that PKI could have discovered the truth behind all these proven misrepresentations had it taken advantage of "the opportunity to examine all the books and records" made available to it by the defendants, and "look[ed] at the actual numbers" behind the defendants' prediction of future sales. J.A. at 669-70. Although, as indicated, the court did not specifically identify the element(s) of fraud it found insufficiently proven, the clear indication is that it was the "reasonable reliance" element; that it was not reasonable to rely on the defendants' statements rather than available records.
 
 
 19
 We think this reason sufficed to preclude recovery as to projections of future profitability through new sales; that another ground sufficed to preclude recovery against Peuler, though not as to DeMaio, as to the five new sales misrepresentation; but that this reason does not suffice, without further factual findings, to preclude recovery on the misrepresentations as to TFI's liabilities.
 
 
 20
 We consider first the representations respecting future profitability. Under Virginia law, as generally, "an action[for fraud] may not be predicated on unfulfilled promises or statements about future events," especially promises regarding future profitability of a business. Elliott, 384 S.E.2d at 756; Sea-Land Svc., Inc. v. O'Neal, 297 S.E.2d 647, 651 (Va.1982). An exception to this rule allows an action for fraud where promises are made with a "present intention not to perform." Id. Because there is no proof that the defendants harbored a present intention not to generate the estimated profits, their estimate of future profitability is not a basis for recovery in fraud. Thus, we affirm the district court's conclusion that PKI has not proved fraud against any of the defendants with respect to the representations respecting future profitability.
 
 
 21
 We next consider the proven misrepresentations that five new sales or deals had already been made. The district court presumably found this not sufficiently proven on the one ground specifically identified: that PKI could not reasonably have relied upon it given the availability of records to verify its accuracy.
 
 
 22
 Without regard to DeMaio's potential liability for these misrepresentations, Peuler could not have been liable, irrespective of the reliance element. As the district court found, only DeMaio made these misrepresentations. Because the record contains no evidence that Peuler even knew of the statements, hence could have had no duty to correct them, she could not be liable for them. The district court's conclusion of non-liability as to this misrepresentation is therefore affirmed as to Peuler--though not on the basis of non-reliance.
 
 
 23
 As to DeMaio, however, the story is different. It is uncontroverted that he made the misrepresentations. There is no finding that he did not intend by them to mislead, nor that they did not mislead to PKI's detriment. That leaves only the lack of reasonable reliance ground as a basis for upholding the district court's rejection of PKI's claim against DeMaio. That may suffice, but given the summary nature of the court's findings and conclusions, we simply cannot with confidence tell. For all the record discloses, the records available to PKI may not have disclosed the falsity of these particular misrepresentations. Under the circumstances, we must vacate that portion of the judgment which relieves DeMaio of liability for these misrepresentations and remand for more detailed findings and conclusions respecting the claim against him. See Sine v. Local No. 992 Int'l Bhd of Teamsters, 644 F.2d 997, 1004 (4th Cir.1981) (remand necessary where district court's factual review not sufficiently detailed to support ultimate findings).
 
 
 24
 Finally, we consider the defendants' misrepresentations of TFI's liabilities, which were proven to be understated by at least $100,000. As to these, the district court ruled that although "the defendants provided certain [false] information regarding finances, they also produced income statements and balance sheets. The plaintiff had the opportunity to examine all the books and records to determine the financial condition of the defendants." J.A. at 669. Under Virginia law, as generally, a fraud claim such as that here in issue may fail under the "prudent purchaser" rule:
 
 
 25
 [w]here ordinary care and prudence are sufficient for full protection, it is the duty of the party to make use of them. Therefore, if false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him, the law, in general, will leave him where he has been placed by his own imprudent confidence.
 
 
 26
 Kuczmanski v. Gill, 302 S.E.2d 48, 50 (Va.1983) (emphasis added). Application of this "prudent purchaser" rule however assumes that the means of knowledge are indeed equally available to the claimant and that of course is not the case if the defendants' records do not themselves reflect the untruth of the representations. Here we cannot tell from the evidentiary record or from the district court's opinion whether PKI could actually have discovered the untruth from the records made available to it, or whether they too were falsified, so that PKI could only have learned of the falsity of the representations--as it claims--from conversations with TFI employees after the purchase. Because we cannot properly review the district court's dispositive conclusion that PKI could not reasonably have relied upon this misrepresentation, we must remand this issue for more detailed findings of fact respecting the information actually made available to PKI by defendants prior to the purchase and for such recommendation of the claim as those findings may warrant.
 
 B
 
 27
 Turning to the district court's ruling that fraud had not been sufficiently proven with respect to DeMaio's failure to disclose his prior felony convictions, we conclude that here the court erred and that its ultimate finding of no-fraud must be reversed.[1]
 
 
 28
 The district court ruled that because Karch never specifically asked DeMaio whether he had a prior criminal record during their January 1993 interview, DeMaio's failure to reveal his prior felony conviction for a fraudulent business transaction could not constitute fraud. J.A. at 669. In so holding, the court misapprehended controlling law. Concealment of a fact "by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 597 (Va.1984). It is not required that the concealment be in the face of a direct inquiry. A "contracting party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud." Spence v. Griffin, 372 S.E.2d 595, 599 (Va.1988) (citing Restatement (Second) of Contracts Sec. 161 (1982) and other authorities).
 
 
 29
 The district court's ultimate factual finding on this issue does not comport with the evidence or with the district court's subsidiary factual findings. The record discloses, and the court found, that the January meeting was held to investigate Peuler's and DeMaio's integrity and background in order for PKI to evaluate their suitability for future employment with PKI in a position of trust. It was in this setting, whose purpose obviously was known to DeMaio (as clearly it was to Peuler, who disclosed her own involvement in a lawsuit) that DeMaio's concealment occurred. The conviction concealed involved the fraudulent falsification of documents in a business setting.[2] Clearly, such a conviction would be material to an evaluation of a potential business executive's integrity. DeMaio himself conceded that he "might want to know such information about someone with whom he was planning to make a business deal" and that he would have revealed the conviction had he been asked. J.A. at 661, 542-44. Karch testified that he would not have entered into any of the subsequent transactions with DeMaio or TFI (the employment agreements, line of credit, asset purchase agreement, etc.) had he known of DeMaio's propensity to criminal fraud as evidenced by his fraud conviction. J.A. at 198-99.
 
 
 30
 Because it is evident from the record that the district court's ultimate finding that DeMaio's concealment did not constitute fraud was decisively based on a misapprehension of controlling law, we must set it aside as clearly erroneous, see Miller v. Mercy Hospital, Inc., 720 F.2d. 356, 361 (4th Cir.1983), and remand with directions to find that the concealment constituted fraud and to award such damages as may be proven to have been caused by the concealment.
 
 IV
 
 31
 We next consider the district court's conclusion that PKI had not proven a breach of fiduciary duty by Peuler and DeMaio.
 
 Although the court specifically found that
 
 32
 Peuler and DeMaio each knew they had a duty of honesty and candor to PKI, a responsibility to discharge their obligations using best efforts, an obligation to report any misconduct or any improper or questionable conduct by employees in the Team Fit division of PKI, and fiduciary duties to PKI.
 
 
 33
 J.A. at 663-63, the court nonetheless concluded that "an employment relation such as this one does not give rise to a fiduciary duty." J.A. at 670. This conclusion is at odds with the court's subsidiary findings of fact and with applicable law and must be reversed.
 
 
 34
 It is well settled in Virginia, as generally, that a corporate officer stands in a fiduciary relationship to the corporation. Saunders v. Russell's, Inc., 3 S.E.2d 193 (Va.1939); Kessler v. Commonwealth Doctors Hosp., Inc., 185 S.E.2d 43, 46 (Va.1971). The defendants, citing Kessler, 185 F.2d at 46, contend that it encompasses only the duty to avoid usurping corporate opportunities and engaging in transactions for personal profit to the detriment of the corporation. We disagree. The duty, as recognized in Virginia, runs considerably wider: corporate officers have "a fiduciary duty to carry out[their] assigned responsibilities," id.; to exercise utmost faith and loyalty, Greenspan v. Osherhoff, 351 S.E.2d 28, 36 (Va.1986); to perform their duties "with the highest fidelity and with the utmost good faith and loyalty." Somers v. Godwin, 27 S.E.2d 909, 913 (Va.1943).
 
 
 35
 Peuler and DeMaio were both Vice Presidents of PKI, and Executive Vice President and General Manager, respectively, of its Team Fit Division, J.A. at 333, 346. Contrary to the district court's conclusions that their employment relationship with PKI created no fidu ciary duty to the corporation, controlling law dictates that it did. We must therefore vacate that portion of the district court's judgment which rejected their claim and remand it for determination whether under Virginia law that duty was breached and, if so, the relief to which PKI may be entitled as remedy.
 
 V
 
 36
 We next consider the district court's failure to award any compensatory damages for breach of the Employment Agreement by Peuler and DeMaio. As indicated, despite having found that a breach occurred, the court included no damages for the breach in its overall award of damages. Its only suggestion of a possible reason was the statement that "the breach gave the plaintiff the right to terminate for cause." J.A. at 670. From this may be inferred a belief that the Agreement limited relief to termination. If this be the basis for the court's failure to assess damages, it was erroneous in law. Although parties to a contract may provide for particular remedies in case of breach so long as they are neither illegal nor contrary to public policy, such a provision does not preclude all other remedies unless "the contract clearly shows an intent that [they are] exclusive." Bender-Miller Co. v. Thomwood Farms, Inc., 179 S.E.2d 636, 638 (Va.1971).
 
 
 37
 The Peuler and DeMaio Employment Agreements did contain a provision that "[PKI] may terminate [Peuler/DeMaio's] employment ... at any time for cause," J.A. at 352, but there is no indication of any intent that this should be the exclusive remedy. If the court actually had some other reason for declining to award damages for the proven breach of these employment contracts, it failed to indicate it. In these circumstances, we must remand their claims for assessment of damages or for the provision by the court of any reasons--other than exclusivity of the termination remedy--for declining to award damages for the breaches found. See United States v. Balistrieri, 981 F.2d 916, 936 (7th Cir.1992) (remand for trial of damages issue where district court had not explained why it had not awarded damages for found breach).
 
 VI
 
 38
 We next consider PKI's challenge to the district court's failure (so far as the record shows) to consider its claim for punitive damages as an added remedy for the conversion of accounts receivable and tangible property for which the court found the appellees liable. We can deal with it quickly. The remedy was sought in PKI's complaint. J.A. at 67-70. So far as we can discern, the possibility of awarding punitive damages was not addressed by the district court. Finally, we could not say that, as a matter of law, the evidence could not support such an award, so that we might sua sponte determine that any error in failing to consider it was harmless and a remand for its consideration unwarranted. That leads to the necessity that this issue too must be remanded to the district court for reconsideration (or first instance consideration). See Jones v. New York Life & Annuity Corp., 985 F.2d 503, 510 (10th Cir.1993) (comparable remand where district court's dismissal of punitive damages claim not explained). In remanding, we express no opinion on the merits of the claim as it should be assessed under controlling Virginia law.
 
 VII
 
 39
 In summary, we affirm the district court's determination that PKI had not proven fraud by any of the appellees in making misrepresentations of future profitability and its failure to find Peuler liable for DeMaio's misrepresentation respecting new sales already completed. We remand for reconsideration in light of this opinion: the claim against DeMaio for fraudulent misrepresentations respecting new sales completed; the claim against all appellees for fraudulent misrepresentations respecting the amount of TFI's liabilities; the claims against DeMaio and Peuler for breach of fiduciary duty; the issue of compensatory damages for the proven breaches by Peuler and DeMaio of their Employment Agreements; and the issue of punitive damages for the proven conversions of tangible and intangible property. We vacate that part of the judgment that finds DeMaio not liable for fraud in concealing the fact of his prior conviction and remand that claim with directions to find him liable and to assess damages.
 
 
 40
 In remanding various claims to the district court for reconsideration, we note our awareness that, as appellees contend, they are entitled to be protected against overlapping, duplicative awards with respect to various of the claims which obviously present that possibility. We also note our awareness that, as appellees contend, the avoidance of such a duplication of damages may possibly have underlain the district court's failure to have awarded damages for some of the liabilities already found. If that be the case, the court may of course now so explain its actions. The court has not yet done so, and we certainly cannot say on the record we review that any specific duplications have thereby been avoided. This is a problem which must be addressed in the reconsideration that we are ordering of various claims.
 
 SO ORDERED
 
 
 [1]
 PKI challenges only the rejection of this claim as to DeMaio, and does not contend that DeMaio's fraud by failure to disclose should be charged as well to Peuler and TFI
 
 
 [2]
 With these documents, DeMaio had falsely represented that a transaction had been completed and retained the $40,000 payment for himself. The facts of this crime are strikingly similar to the manner in which DeMaio and Peuler later converted accounts receivable that belonged to PKI for their own use. Knowledge of this conviction obviously might have prompted PKI to refrain from hiring DeMaio, thereby saving itself from the eventual conversion