**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL 399, AFL–CIO, Plaintiff,**

v.

**MAXIMUM AIR FLOW CO., Defendant.**

**Maximum Air Flow Co., Counter Claimant,**

v.

**Sheet Metal Workers' International Association, Local 399, AFL–CIO, Counter Defendant.**

**Civil Action No. 2:07–2912–CWH.**

United States District Court, D. South Carolina, Charleston Division.

July 11, 2012.

Arlus Jeremiah Stephens, Murphy Anderson, Washington, DC, Peter Wilborn, Derfner Altman and Wilborn, Charleston, SC, for Plaintiff/Counter Defendant.

Christopher W. Johnson, Gignilliat Savitz and Bettis, Columbia, SC, Stephen Terry Savitz, Gignilliat Savitz and Bettis, Columbia, SC, for Defendant/Counter Claimant.

## ORDER

C. WESTON HOUCK, District Judge.

This matter is before the Court upon the plaintiff's motions for judicial confirmation of an interest-arbitration award and a grievance-arbitration award. The defendant has counterclaimed for declaratory and injunctive relief and seeks to vacate both arbitration awards. For the reasons discussed below, the Court hereby confirms the arbitration awards.

## I. Background

### A. The parties

The plaintiff, Sheet Metal Workers' International Association, Local 399, AFL–CIO (the "Union"), is organized as an agent and local union of the Sheet Metal Workers' International Association for the purposes of representing sheet metal workers in collective bargaining with their employers. The defendant, Maximum Air Flow Co. (the "Company"), is a small, privately-owned sheet metal company located

in Columbia, South Carolina, which constructs and installs sheet metal ducting for heating and ventilation systems.

### B. The agreements

The Union and the Company have been parties to several collective bargaining agreements since 1996. In September, 1996, the Union and the Company entered into a pre-hire agreement which expired in February of 1997 and was not renewed.[1] In April of 2004, the Union and the Company entered into a second pre-hire agreement which began on May 1, 2004 and ended on April 30, 2005. The case at bar arises out of the third pre-hire agreement, which was effective from August 22, 2005 to July 31, 2006 (the "Agreement"). The Agreement included a dispute-resolution procedure which set forth a mandatory multi-stage dispute-resolution process to apply to "[g]rievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement." (Agreement (ECF No. 38–2) Article X, Section 1). Under Article X, Section 8(a) of the Agreement, the Union and the Company were obligated to use the arbitration procedure

administered by the National Joint Adjustment Board ("NJAB").

■ The Agreement also included an "extension clause,"[2] and an interest arbitration clause:[3]

In addition to the settlement of grievances arising out of interpretation or enforcement of this Agreement as set forth in the preceding sections of this Article, any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement shall be settled as hereinafter provided: (a) Should the negotiations for a renewal of this Agreement or negotiations regarding a wage/fringe reopener become deadlocked in the opinion of the Union representative(s) or of the Employer('s) representative(s), or both, notice to that effect shall be given to the National Joint Adjustment Board.
* * *

The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment Board. The unanimous decision of said Board shall be

---

1. A "pre-hire agreement" is an agreement between a union and a building or construction industry employer in which the union does not represent a majority of employees. *Clark v. Ryan,* 818 F.2d 1102, 1106–1107 (4th Cir.1987).

2. Article XVI, Section 1 contains the "extension clause," which provides:

   This Agreement and Addenda attached hereto, shall become effective on the **22nd day** of **August, 2005,** and remain in full force and effect until the **31st day** of **July, 2006.** and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto

have been terminated by either party through written notice, provided that if this Agreement contains Article X, Section 8, it shall continue in full force and effect until modified by order of the National Joint Adjustment Board or until the procedures under Article X, Section 8 have been otherwise completed.

3. An interest arbitration clause is one in which the parties agree to arbitrate disputes over the terms of a new collective bargaining agreement in the event of a deadlock. *N.L.R.B. v. Greensboro Printing Pressmen & Assistants' Union No. 319,* 549 F.2d 308, 308 n. 3 (4th Cir.1977) (per curiam). Interest arbitration clauses are generally enforceable once they are included in a collective bargaining agreement. *Sheet Metal Workers' Int'l Ass'n. Local 14 v. Aldrich Air Cond., Inc.,* 717 F.2d 456, 458 (8th Cir.1983).

final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached. . . .

The Agreement provided that "all effective dates in the new agreement shall be retroactive to the date following the expiration date of the expiring agreement." (Article X, Section 8(d)). In addition. Article XVI, Section 4 of the Agreement contained the Company's waiver of its right to repudiate it:

> Each employer hereby waives any right it may have to repudiate this Agreement during the term of the Agreement, or during the term of any extension, modification or amendment to this Agreement.

On May 2, 2006, the Union gave written notice to the Company that it wished to renew the Agreement. (ECF No, 38–3). The parties met on July 12, 2006, and on July 20, 2006, to negotiate a new agreement, but the parties did not reach an agreement.

### C. Interest arbitration by the NJAB

On February 2, 2007, the Union submitted the unresolved contract negotiations to the NJAB, pursuant to the interest arbitration clause set forth in Article X, Section 8 of the Agreement. (ECF No. 38–4). On February 6, 2007, the NJAB scheduled a hearing for February 27, 2007, in Orlando, Florida. (ECF No. 38–5). After receiving notice of the hearing, the Company's counsel wrote to the NJAB on February 21, 2007, requesting that the NJAB reject the Union's petition, and informing it that "the Union has lost majority support among the Company's employees, so there is no collective bargaining agreement to arbitrate, and the Company has notified the Union of this fact." (ECF No. 38–6 at 2). On February 21, 2007, the NJAB acknowledged the Company's letter, made it part of the record, and invited the Company to argue the matter at the NJAB hearing on February 27, 2007. (ECF No. 38–7 at 2). The Company did not attend the NJAB hearing. On February 27, 2007, the NJAB ordered that "the parties shall execute the current agreement negotiated by the area contractor group and Local 399 retroactive to August 1, 2006." (ECF No. 38–8 at 2). The order specifically stated:

> Your attention is directed to the following language contained in the Procedural Rules of the NJAB under Article X. Section 8(a):
>
> "The Unanimous decision of said Board shall be final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached"

(ECF No. 38–8 at 3).

The Company refused to comply with the NJAB decision on the grounds that the February 27, 2007 NJAB-awarded agreement was a pre-hire agreement. (See ECF No. 41 at 7). On March 26, 2007, the Company's counsel informed the Union by letter as follows:

> It continues to be the Company's position that the Union does not enjoy majority support among the bargaining unit members and, therefore, any agreement between the Company and the [Union] to represent those individuals is improper. Accordingly, the company believes the National Joint Adjustment Board for the Sheet Metal Industry was without jurisdiction to hear the matter you submitted. To the extent the decision might be binding on the Company, however, this letter is to serve as notice of repudiation of the agreement de-

scribed in the NJAB's decision.[4] (ECF No. 38–9). The Company contends that because its March 26, 2007 letter properly repudiated the NJAB-awarded pre-hire agreement, the NJAB had no authority to award damages based on the alleged breach of that agreement.

### D. Grievance arbitration by the NJAB

The Union considered the Company's failure to abide by the NJAB decision to be a breach of the contract between the Company and the Union. Accordingly, on May 11, 2007, the Union filed a grievance over the Company's failure to abide by the NJAB-ordered agreement retroactive to August 1, 2006. (ECF No. 38–10). On October 25, 2007, a panel of the NJAB heard this grievance. The Company participated in this hearing, submitting payroll records and arguing its position. (ECF No. 38–1 at 3, ¶ 12). On November 27, 2007. the NJAB panel issued its decision in favor of the Union and calculated that the Company's breach of the Agreement resulted in $389,504.00 in damages from August 5, 2006 through September 28, 2007. The panel ordered damages of $341,915.00 to be paid to the Union's fringe benefits fund, and a separate $47,589.00 to be paid to the Local 399 Joint Apprenticeship and Training Committee. (ECF No. 38–11 at 2).

### II. Procedural History

On August 23, 2007, the Union brought this action against the Company, pursuant to § 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185 (the "LMRA"), seeking judicial confirmation and enforcement of the February 2007 in-

terest-arbitration award. On May 9, 2008, the Union filed an amended complaint against the Company which sought judicial confirmation and enforcement of the NJAB's February 2007 interest-arbitration award as well as the November 2007 grievance-arbitration award. The Union also sought its costs and reasonable attorneys' fees expended to secure the Company's compliance with the two arbitration awards, pursuant to Article X, Section 6 of the Agreement. The Company answered and asserted counterclaims, contending that (1) the NJAB award was in violation of public policy because it required the Company to enter into a collective bargaining agreement despite the express manifestation by the Company's employees that the Union was not their agent for collective bargaining, and that the NJAB awards did not draw: their essence from the parties' pre-hire agreement; and (2) the Union was in breach of the pre-hire agreement because the Union had failed to provide qualified workers to the Company, as required by the Agreement. The Union answered the defendant's counterclaim on May 19, 2008. The Court issued an order on August 6, 2008, holding that the dispute between the Company and the Union was a "labor-management" dispute, as defined in the LMRA, so that the grievance procedure contained in Article X, Section 1 of the Agreement applied. As the parties had agreed to submit the Company's breach of contract counterclaim to arbitration, the Court granted the Union's motion to stay proceedings on that issue pending resolution in arbitration. (ECF No. 36). On September 1, 2009, the Union filed the present motion to enforce the arbitration

---

4. In its brief filed with the Court, the Company relied on *Industrial TurnAround Corp. v. N.L.R.B.*, 115 F.3d 248, 254–255 (4th Cir. 1997). and *Clark v. Ryan*, 818 F.2d 1102, 1107 (4th Cir.1987). for the proposition that, in the Fourth Circuit, the employer retains the right to repudiate a pre-hire agreement at any time prior to achievement of majority status by the union. (ECF No. 41 at 8).

awards. (ECF No. 38). After the matter was fully briefed, the Court heard oral argument and took the matter under advisement.

### III. Discussion

At oral argument, the parties disagreed as to whether the Federal Arbitration Act ("FAA") applied to this case. Pursuant to the FAA. a notice of a motion to vacate or modify an arbitration award must be served upon the adverse party "within three months after the award is filed or delivered." 9 U.S.C. § 12. The Union argued, under this law, that the Company had not timely moved to vacate or modify either arbitration award. (ECF No. 38 at 18–19; ECF No. 42 at 10–11), At oral argument, the Union proposed that even if the Court were to apply the statute of limitations set forth in the South Carolina Uniform Arbitration Act (the "UAA"), the Company nonetheless had not timely moved to vacate or modify the awards, because the UAA required that a motion to vacate or modify an arbitration award "shall be made within ninety days after delivery of a copy of the award to the applicant[.]" S.C. Code Ann. § 15–48–130(b).

In response, the Company argued that the FAA "does not apply to this case because the grounds asserted by the Company for rejection of the Union's petition are not covered by the FAA, and the Fourth Circuit has ruled that the FAA does not apply to labor arbitrations." (ECF No. 41 at 10).

▮ The Court need not rely on the FAA, because, "in this circuit, the FAA is not applicable to labor disputes arising from collective bargaining agreements." *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 879 (4th Cir.1996) (citing *Domino Sugar Corp. v. Sugar Workers Local Union 392,* 10 F.3d 1064, 1067 (4th Cir.1993)). This Court has already held, in its August 6, 2008 order, that the dispute between the Union and the Company was a "labor-management" dispute, as defined in the LMRA. (FCF No. 36 at 11). Section 301 of the LMRA provides this Court with subject-matter jurisdiction over this case. *See, e.g., Allied Mechanical Contractors, Inc. v. Indus. Relations Council,* 685 F.Supp. 552, 564–65 (W.D.N.C.1988) (citing 29 U.S.C. § 185(a)). As the Fourth Circuit has recognized, § 301 of the LMRA provides no statute of limitations period for actions to confirm or vacate arbitration awards. *See, e.g., Int'l Longshoremen's Assoc. v. Cataneo Inc.,* 990 F.2d 794, 799 (4th Cir.1993); *Sheet Metal Workers Int'l Assoc. v. Power City Plumbing & Heating, Inc.,* 934 F.2d 557, 559 (4th Cir.1991). In order to determine a statute of limitations where none is provided, courts usually look to the most analogous state statute of limitations. *See, e.g., DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 158, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).[5] Applying that rule, in *Cataneo,* the Fourth Circuit affirmed the district court's application of Maryland's thirty-day statute of limitations governing motions to vacate arbitration awards. 990 F.2d at 799, n. 10, & 800.

In contrast, when there is no analogous state statute, or "when a rule from elsewhere in federal law clearly provides a closer analogy than available state stat-

---

5. Even prior to the *DelCostello* decision, the Fourth Circuit had held that it was proper to look to state law for a determination of the relevant limitations period for a claim under 29 U.S.C. § 185. *See Sine v. Local No. 992 Int'l Bhd. of Teamsters,* 644 F.2d 997, 1002 (4th Cir.1981) ("Because this action against the Company is one which requires the vacation of an arbitrator's award, we characterize the suit as one to vacate an award and look to the applicable arbitration statute of the State for limitations of the action.").

**398**

utes, and when the federal policies at stake" make that rule more appropriate, then a court should borrow the statute of limitations from a suitable federal statute. *DelCostello*, 462 U.S. at 172, 103 S.Ct. 2281. For example, in *Power City Plumbing*, West Virginia law did not set forth any limitations period regarding actions to vacate an arbitration award. Accordingly, the district court turned to the analogous federal law (9 U.S.C. § 12) to determine the statute of limitations. 934 F.2d at 559–60. On appeal, the Fourth Circuit held that the district court "correctly 'borrowed'" the limitations period from federal law when there was no controlling state law. *Id.* at 560.

 With these cases in mind, the Court will apply South Carolina's ninety-day statute of limitations, as set forth in the UAA. S.C. Code Ann. § 15–48–130(b), to the facts of this case. As previously stated, the NJAB's interest-arbitration award was dated February 27, 2007, and the NJAB's grievance-arbitration award was dated November 27, 2007. The Company did not challenge either award within the ninety-day period. Indeed, the Union filed its complaint to confirm the interest-arbitration award on August 23.2007, and the Company counterclaimed to overturn the arbitration award and for declaratory relief on October 26, 2007, some ten months after the interest-arbitration award had been issued. When the Union filed its amended complaint to enforce both arbitration awards on May 9, 2008, the Company counterclaimed to overturn the arbitration award on May 12, 2008. approximately six months after the grievance-arbitration award was issued. The Company's challenges to the interest-arbitration award and the grievance-arbitration award should have been filed within ninety days of the issuance of each, but were not. Therefore, the Company's motions to vacate the awards are not timely.

Accordingly, the Court grants the Union's motion (ECF No. 38) to enforce the arbitration awards.

**AND IT IS SO ORDERED.**